UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LUZELEINA ORTIZ,

             Plaintiff,

    -vs-

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF
SOCIAL SECURITY

             Defendant.

_____

**DECISION AND ORDER**
**No. 13-CV-6463(MAT)**

## INTRODUCTION

Plaintiff, Luzeleina Oritz ("Plaintiff" or "Ortiz"), brings this action under Titles II and XVI of the Social Security Act ("the Act"), claiming that the Commissioner of Social Security ("Commissioner" or "Defendant") improperly denied her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

Currently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, I grant the Commissioner's motion, deny the Plaintiff's cross-motion, and dismiss the Complaint.

## PROCEDURAL HISTORY

On February 15, 2011, Plaintiff filed applications for DIB and SSI, alleging disability as of May 10, 2010, which were denied. Administrative Transcript [T.] 143-144, 85-99.  A hearing was held on May 22, 2012 before administrative law judge ("ALJ") John P.

Costello, at which Plaintiff, Plaintiff's friend Henry Baggling ("Baggling"), and a vocational expert ("VE") testified. T. 39-75. On August 9, 2012, the ALJ issued a decision finding that Plaintiff was not disabled during the relevant period. T. 13-25.

On July 3, 2013, the Appeals Councils denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. T. 1-6. This action followed.

## FACTUAL BACKGROUND

**Relevant Medical Evidence**

**<u>Plaintiff's Physical Health History</u>**

Following a December 4, 2007 motor vehicle accident, Plaintiff was seen at the Rochester Brain and Spine Center ("RBSC") for back pain. T. 376-377. An MRI of Plaintiff's lumbosacral spine showed a herniated lumbar disc. T. 377. She was initially treated with steroid injections, and later underwent a surgical right discectomy and foraminatomy. T. 377-379. Following her surgery, Plaintiff was treated on a continued basis at RBSC and also received chiropractic treatments. T. 345-353, 357-366.

In October 2010, Plaintiff met with Roger Ng, M.D. at RBSC, who assessed intervertebral disc displacement lumbar without myelopthay. T. 353. Upon examination, Dr. Ng reported that Plaintiff's gait was normal, her neck and spinal regions were within normal limits to inspection and palpation, but that Plaintiff exhibited tenderness to palpation in the lumbar spine and sacroiliac joint. T. 351-352. Plaintiff's motor strength was

intact, her muscle tone was normal, her range of motion was physiologic and full, heel toe walking was normal, her straight leg raises produced low back pain, and her trunk rotation was positive bilaterally.  T. 352.  Dr. Ng noted that Plaintiff's Patrick test was positive bilaterally, her sensation was grossly intact to light touch, her reflexes were 2+ and symmetric, her cranial nerves were intact and she had no coordination deficits.  T. 352.

In December 2010 and January 2011, Plaintiff was seen at Unity Spine Center ("USC"), complaining of continued sharp pain in her lower back to hip that radiated into her right leg.  T. 664, 667. Treatment notes show that Plaintiff's lumbar mobility was decreased and her sensory and motor strength in the right lower extremity were slightly decreased due to pain.  T. 668.  An MRI of Plaintiff's lumbar spine from January 2011 showed stable post-operative findings and no recurrent herniation.  T. 603.  Plaintiff returned to USC in February 2011, at which time she reported that sitting, standing or walking for long durations aggravated her back pain.  T. 670.  Treatment notes show that Plaintiff had no motor weakness, her gait was slow with a slight limp, and her right lower extremity at L2 was decreased.  T. 670.

In October 2011, Plaintiff was seen at Unity Rehab and Neurology, complaining of continued back pain.  Plaintiff's supine straight leg raises were negative, she had no motor weakness, and her sensation was decreased at L2 in the right lower extremity.

Plaintiff was diagnosed with right leg and bilateral foot pain. T. 1122.

Also in October 2011, Plaintiff saw Dr. Ng complaining of back pain and right foot pain. T. 1034-1035. Dr. Ng assessed intervertebral disc displacement and degeneration lumbar without myelopthy. T. 1034-1035.

**Plaintiff's Mental Health History**

In 2010, Plaintiff was treated at Huther-Doyle for chemical dependency. T. 336-343. Substance abuse counselor Brenda Brightful ("Brightful") diagnosed alcohol and cannabis dependence and assessed a Global Assessment Functioning ("GAF") score of 55. T. 342. Notes from Plaintiff's discharge summary report dated September 16, 2010 show that Plaintiff had completed all treatment, her goals were met, no additional treatment was necessary, and her GAF score was assessed at 75. T. 336-337.

While attending counseling at Huther-Doyle, Plaintiff was also treated at St. Mary's Mental Health Clinic for depression. Plaintiff's mental status examinations showed depressed mood, but were otherwise generally unremarkable. T. 400-461. While there, Plaintiff attended group therapy when she was able to find child care. In November 2010 Plaintiff was assessed a GAF score of 65. T. 402. Treatment notes from 2011 show that Plaintiff continued to complain of depressed mood and financial stressors, but that she was expressing herself well in therapy and reported feeling relief

by attending these sessions.  T. 703-734.  In April 2011, Plaintiff was assessed a GAF score of 50.  T. 731.

In January 2012, treatment notes show that Plaintiff continued to be actively engaged in group therapy, her mood was euthymic, and she was assessed a GAF score of 55.  T. 1038-1040.

**Consultative Examinations/Opinions**

In March 2010, Plaintiff underwent a consultative examination with Adele Jones, Ph.D. who assessed that Plaintiff could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new task, perform complex tasks independently, make appropriate decisions, and relate adequately with others.  Dr. Jones diagnosed post-traumatic stress disorder, depressive disorder, and alcohol, cocaine, and cannibis dependence. T. 1022.  Dr. Jones recommended continued psychiatric and drug addiction treatment.  T. 1023.

Also in March 2010, Plaintiff underwent a consultative examination by George Alexis Sirontenko, D.O. who diagnosed morbid obesity, history of depression, musculoskeletal ligamentous degenerative back pain.  T. 1032.  He assessed moderate limitations for kneeling, squatting, bending, and climbing stairs, inclines and ladders on a repetitive basis.  He also assessed that Plaintiff needed to avoid lifting objects over her head on a repetitive basis.  T. 1032.

In April 2010, V. Reddy, Ph.D. completed a mental residual functional capacity assessment in which he opined that Plaintiff could follow, understand, and perform simple instructions, directions, and tasks, maintain attention, concentration and a regular work schedule, make appropriate decisions, relate adequately with others, but had difficulty dealing with stress. Dr. Reddy opined that Plaintiff "appears capable of performing the basic functional requirements of unskilled work."  T. 1026.

Also in April 2010, Marvin Blase, M.D. completed a mental residual functional capacity assessment form and reported that he was in agreement with Dr. Reddy's assessment and that no "additional documentation was needed."  T. 1028-1029.

In February 2011, Plaintiff underwent a consultative examination with Christine Ransom, Ph.D. who opined that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule, and learn simple new tasks.  She opined further that Plaintiff had moderate difficulty performing complex tasks, relating adequately with others and appropriately dealing with stress due to major depressive disorder.  Dr. Ransom diagnosed major depressive disorder, alcohol and marijuana dependence, and back pain.  She recommended that Plaintiff continue mental health treatment and drug and alcohol rehabilitation.
T. 470-471.

Also in February 2011, Plaintiff underwent a consultative examination with orthopedist Sandra Boehlert, M.D. who diagnosed lumbar radiculopathy and a psychology disorder.  T. 477-478. Dr. Boehlert assessed moderate limitations for heavy lifting, bending, twisting, ambulating, "or staying in one position for too long."  T. 478.

On February 23, 2011, Edward Kamin, Ph.D. reviewed the medical evidence in the file and completed a psychiatric review technique form.  He concluded that Plaintiff's medically determinable impairments of depressive disorder and polysubstance abuse disorder did not meet the criteria for Listings 12.04 and 12.09.  T. 490, 495.  Dr. Kamin determined that Plaintiff could understand, remember and follow simple directions and sustain and maintain an adequate pace.  T. 503.  Dr. Kamin assessed that Plaintiff could relate and respond in a low contact setting, adapt to change and use appropriate judgment to make simple decisions.  T. 503.

In March 2011, S. Putcha, M.D. reviewed Plaintiff's medical record and assessed that Plaintiff could occasionally lift and carry ten pounds, could frequently lift and carry less than ten pounds, could stand and/or walk at least two hours in an eight hour workday, sit for about six hours in an eight hour workday, and was occasionally limited in performing postural activities.  T. 510-511.

In June 2011, Allen Hochberg, Ph.D. reviewed the medical evidence in the record and completed a psychiatric review technique

form.  T. 735-752.  He concluded that the Plaintiff's impairments did not meet Listing 12.04 and 12.09.  T. 738, 743.  Dr. Hochberg assessed that Plaintiff was mildly limited in performing activities of daily living and social functioning, and moderately limited in maintaining concentration, persistence or pace.   T.  745. Dr. Hochberg reported that Plaintiff could understand, execute and remember simple instructions and work-like procedures, maintain attention and concentration for at least two-hour intervals, make simple work-related decisions, maintain a normal workday/week and consistent pace, and might have difficulty working closely with others and adapting to changes in a routine work setting.  T. 751.

**The Hearing Testimony**

Plaintiff, who was born in 1969, attended school through the tenth grade and had previously worked as a nursing home assistant, housekeeper/home health-aide, and a cleaner for an apartment complex.  T. 43-46.  She testified that she was fired from her most recent job with a nursing home in 2008 "[b]ecause of the comments or the talking back [she] used to do."   T. 46-47.   Plaintiff testified that she lived with her three children, ages 3, 18 and 20.  T. 43.  She testified further that she was 5 feet 9 inches tall and weighed 309 pounds.  T. 47.  According to Plaintiff, her most serious health problem was her constant low back pain, which she described as a ten out of ten on a pain scale.  T. 49.

She testified that she needed help caring for her two older children, both of whom had ADHD.  T. 58-60.  She also testified

that she had a driver's license, drove to appointments and the grocery store, fixed TV dinners, washed a few dishes and did small loads of laundry.  T. 61.  She testified that she can use a broom to sweep the floor for instances where "[her] baby spilled or something."  T. 61.

Baggling, Plaintiff' friend of ten years, testified that he lived with Plaintiff and saw her daily when he got home from work. T. 63-64.  Baggling testified that Plaintiff had problems with her lower back and legs and could not sleep at night.  T. 64-65. Baggling drove Plaintiff to most of the places she needed to go and helped her grocery shop.  He testified further that Plaintiff's mood had been sad or depressed for about three and one half to four years.  Braggling also testified that he gave Plaintiff "reefers" to help her sleep, which she smoked maybe two or three times a month.  T. 64-65, 68.

VE Julie Andrews also testified at the hearing.  The ALJ asked the VE to consider an individual having the same age, education and work experience as Plaintiff who could perform sedentary work and simple tasks allowing her to change positions every 40 minutes and requiring only occasional contact with co-workers and the general public.  The VE testified that such an individual could not perform Plaintiff's past work but could perform the jobs of label pinker and brake linings coder, both of which existed in significant numbers in the national economy.  T. 71-72.

**DISCUSSION**

## I. Jurisdiction and Scope of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405 (g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g)(2007). The section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Section 405 (g) limits the scope of the Court's review to two inquiries: determining whether the Commissioner's findings were supported by substantial evidence in the record as a whole, and whether the Commissioner's conclusions are based upon an erroneous legal standard. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).

Under Rule 12(c), judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the

merits is possible merely by considering the contents of the pleadings.  <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639, 642 (2d Cir. 1988).  A party's motion will be dismissed if, after a review of the pleadings, the Court is convinced that the party does not set out factual allegations that are "enough to raise a right to relief beyond the speculative level."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

## II.   The Commissioner's Decision Denying Plaintiff Benefits is Supported by Substantial Evidence in the Record

The Social Security Administration has promulgated a five-step sequential analysis that the ALJ must adhere to for evaluating disability claims.  20 C.F.R. § 404.1520.

The ALJ in this case used this sequential procedure to determine Plaintiff's eligibility for disability benefits.  The ALJ found that:  Plaintiff did not engage in substantial gainful activity since May 10, 2010, the alleged onset date;  that Plaintiff has the severe impairments of low back pain caused by a history of herniated disc at L5-S1, morbid obesity and depression, but that Plaintiff does not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments; that Plaintiff has the residual functional capacity ("RFC") to perform a range of sedentary work; that Plaintiff is unable to perform her past relevant work; and that, considering Plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can

perform, namely label pinker and brake line coater.  Therefore, the ALJ concluded that Plaintiff was not disabled during the relevant period.  T. 13-25.

## III. Analysis of Plaintiff's Arguments

### A.  The ALJ Failed to Reasonably Evaluate the Medical Evidence at Step 3 and Failed to Develop the Record

Plaintiff argues that remand is warranted on the basis that the ALJ failed to: (1) evaluate the relevant medical evidence at Step 3 of his analysis that allegedly supports a finding that Plaintiff's impairments meet the requirements of Listing 1.04A; and (2) to consult a medical expert when considering whether Plaintiff's impairments medically equaled a Listing impairment. Pl's Mem (Dkt. No. 14-1) at 20-21.

### 1.  Listing 1.04A

To be considered disabled under Listing 1.04A, Plaintiff must demonstrate evidence of a disorder of the spine that results in the compromise of a nerve root or the spinal cord that also includes evidence of nerve root compression characterized by neuro-anatomic distribution of pain;  limitation of motion of the spine;  motor loss accompanied by sensory or reflex loss; and, if there is involvement of the lower back, positive straight-leg raising test (both sitting and supine).  20 C.F.R. Part 404, Subpart P, Appendix 1.  It is the plaintiff's burden to "demonstrate that [his] disability [meets] 'all of the specified medical criteria' of a spinal disorder."  Otts v. Comm'r of Soc. Sec., 249 F. App'x 887,

888 (2d Cir. 2007), quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 531 (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  <u>Sullivan</u>, 493 U.S. at 530 (citation omitted).

Here, the ALJ considered Listing 1.04A (disorders of the spine), but found that Plaintiff's lumbar spine impairment did not meet listing-level severity because Plaintiff "has not exhibited each of the necessary neurological deficits[.]"   T. 16. Specifically, the ALJ explained that "[i]n orthopedic consultative examinations performed in April 2010 and February 2011, there was no evidence of muscle atrophy, sensory abnormality, or reflex deficit motor loss accompanied by sensory or reflex loss."  He went on to explain that "[c]ontemporaneous progress notes from the treating sources at Unity Rehabilitation and Neurology have consistently noted no evidence of motor weakness or atrophy." T. 16.  This finding is supported by substantial evidence.

As Plaintiff points out, treatment notes from Unity Rehab and Neurology show that Plaintiff did experience some diminished mobility/restricted range of motion during the relevant time period.  For example, treatment notes from September 16, 2010 and October 28, 2010 show that Plaintiff's motor abilities were "4/5 due to pain," she had a slight limp, and had "decreased lumbar mobility."  T. 1077, 1080.  However, these clinical findings were not consistent throughout the record.  For instance, in June 2010 and October 2011 treatment notes from Unity Rehab and Neurology

show that Plaintiff had no motor weakness.  Further, as the ALJ
pointed out, these same treatment notes also show that Plaintiff
had either only slightly diminished sensory loss or none at all,
that her balance and gait were intact, and that her deep tendon
reflexes were symmetric.  T. 656, 1122.

Additionally, treatment notes from October 2010 from Dr. Ng
show that Plaintiff's gait and heel/toe walking were normal, her
spinal regions were grossly within normal limits to inspection and
palpation, her motor strength was intact, her range of motion was
physiologic and full range, her sensation was grossly intact to
light touch, her reflexes were 2+ and symmetric, her cranial nerves
were intact and she had no coordination deficits.  T. 352-353.

Likewise, Dr. Sirotenko consultatively examined Plaintiff in
the spring of 2010 and reported that Plaintiff's gait was normal,
she could walk on heels and toes, and needed no assistance rising
from a chair.  T. 1032.  Dr. Boehlert consultatively examined
Plaintiff in February 2011 and reported that Plaintiff's gait was
normal and she could walk on heels/toes without difficulty.
Dr. Boehlert reported further that Plaintiff's strength was full in
the upper and lower extremities with no muscle atrophy or sensory
abnormality and her reflexes were present and equal.  T. 477-478.

Based upon all the medical evidence in the record, including
Plaintiff's treatment notes and the consultative opinions from
Drs. Sirotenko and Boehlert, the Court finds that the ALJ correctly

determined that Plaintiff does not meet all of the requirements under Listing 1.04A.

## 2.  Duty to Develop the Record at Step 3

It is well settled that the ALJ has an affirmative duty to develop the medical record and seek out further information where the evidence is inconsistent or contradictory, or where evidentiary gaps exist.  See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).

In addition, an ALJ "may . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s) and on whether [her] impairment(s) equals the requirements of any impairment" in the Listings.  20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(iii).  Further, the Social Security Administration's own internal operating guide, the Manual on the Social Security Administration Hearings, Appeals, and Litigation Law ("HALLEX") section I-2-5-34, which Plaintiff draws the Court's attention to, provides that "an ALJ may need to obtain medical expert testimony: (1) when the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s); or (2) when the medical evidence is conflicting or confusing; or (3) when the ALJ desires expert medical opinion regarding the onset of an impairment.  See HALLEX § I-2-5-34(A) (Sept. 28, 2005) (http://www.ssa.gov/OP_Home/hallex/I-02/I-2-5-34.html)  (last visited July 24, 2014).

The Court's review of the ALJ's decision in this case in light of the record as a whole supports the conclusion that the ALJ did

not abuse his discretion by failing to consult a medical expert or to re-contact any of Plaintiff's treating physicians to determine whether Plaintiff's impairments met or medically equaled the Listings.  As discussed above, the ALJ thoroughly addressed the well-developed medical evidence, including Plaintiff's records from her treating physicians and the opinion evidence from Dr. Ransom, in assessing equivalence with Listing criteria at step three of his sequential evaluation.  No obvious evidentiary gaps have been identified, and Plaintiff has otherwise failed to identify any information to suggest that additional expert testimony or additional information from any of Plaintiff's treating physicians might have led the ALJ to reach a different conclusion.  Indeed, where, as here, there are no obvious gaps, and the record presents "a complete medical history," the ALJ is under no duty to seek additional information before rejecting a claim.  Id. at 79, n. 5 (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)).

Accordingly, the Court finds no basis for remand on account of the ALJ's failure to develop the record with respect to his Step 3 determination.

### B.   The ALJ's RFC Determination is Supported by Substantial Evidence

Plaintiff argues that the ALJ's RFC determination that Plaintiff is able to perform a range of sedentary work is flawed because: (1) the ALJ relied on the absence of evidence, rather than properly developing the record as to Plaintiff's limitations with

RFC assessments from Plaintiff's treating physicians; (2) that the RFC is unsupported by medical evidence; (3) that the RFC lacks specificity for a VE to determine the extent in which the occupation base for sedentary work is eroded.

### 1.  The ALJ Inappropriately Relied on the Absence of Evidence

As an initial matter, an ALJ may "rely not only on what the record says, but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (citing, inter alia, Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982) (per curiam)). As the ALJ noted here, no treating physician offered a specific RFC assessment. Tr. 22. Because Plaintiff bears the burden of proving her RFC, the ALJ could reasonably rely on the lack of evidence that Plaintiff was unable to perform a range of sedentary work. See 20 C.F.R. § 404.1545(a)(3) (the claimant is responsible for providing the evidence used in the residual functional capacity determination); see also Dumas, 712 F.2d at 1553.

Moreover, the ALJ's extensive discussion of the medical evidence in the record pertaining to Plaintiff's physical impairments reveals that substantial evidence existed to support his findings. For example, the ALJ discussed Dr. Ng's October 2011 examination of Plaintiff, at which time Dr. Ng noted that Plaintiff appeared well, she walked with a normal gait, her sensation was grossly intact to light touch and she exhibited normal, full muscle strength.  T. 20.

The ALJ also discussed the findings made by consultative examiner Dr. Sirotenko, who reported that Plaintiff was in no acute distress at her examination, she had a normal gait/station and she could walk on her heels and toes, and that her lower extremity strength was only slightly diminished.  Dr. Sirotenko noted that Plaintiff had "no features of lower extremity radiculopathy" and assessed that Plaintiff had moderate limitations for kneeling, squatting, bending, climbing stairs, inclines or ladders on a repetitive basis and lumbar spine forward flexion, extension and rotation, and recommended that Plaintiff avoid lifting objects overhead on a repetitive basis.  T. 19, 1020-1033.

The ALJ also considered the findings made by consultative examiner Dr. Boehlert, who reported that Plaintiff's gait was normal at her examination, that she used no assistive device, needed no help changing for the exam or getting on or off the exam table, and that Plaintiff's strength was full, and she had no muscle atrophy or sensory or reflex abnormality.  T. 20, 472-475. Notably, Dr. Boehlert opined in her medical source statement that Plaintiff was moderately limited with respect to lifting, heavy bending, twisting, heavy ambulating, or staying in one position for too long.  Id.

This evidence, as well as the ALJ's lengthy discussion of Plaintiff's overall medical history and her related treatments, indicated that despite Plaintiff's back condition, she retained

-18-

some functional use of her back and extremities.  Additionally, Plaintiff testified at the hearing that she could lift about 10 pounds, sit or stand for about 35 to 40 minutes, and could walk for about 20 minutes.  She also testified that she has a driver's license and drives to medical appointments or the grocery store, she can cook microwave dinners, can wash a few dishes, and can do small loads of laundry.  T. 18.

In sum, the physical findings, as well as Plaintiff's testimony, demonstrated that Plaintiff's back condition did not prevent her from the exertional requirements of sedentary work, with certain additional limitations.

Where there are no deficiencies in the record, an ALJ is not under an affirmative obligation to develop the administrative record.  See Perez, 77 F.3d at 47.  As demonstrated here, the record contained no obvious gaps and the ALJ was able to make a disability determination based on the available evidence.  For this reason, this Court finds that the ALJ had no duty to further develop the record.

### 2.    The RFC is Unsupported by Medical Evidence

In assessing a claimant's RFC, the ALJ must consider all of the relevant medical and other evidence in the case record to assess the claimant's ability to meet the physical, mental, sensory, and other requirements of work.  20 C.F.R.

§ 404.1545(a)(3)-(4);  see also SSR 96-8p, SSR LEXIS 5, 1996 WL
374184 (S.S.A. July 2, 1996).

In this case, after considering the entire record, the ALJ
concluded that although Plaintiff had some mental and physical
limitations, the evidence did not support the presence of
limitations that would preclude Plaintiff from performing sedentary
work with additional limitations, including:  she must change
positions briefly every 40 minutes; she is limited to the
performance of simple tasks; and she can have only occasional
contact with co-workers and with the general public.  T. 17-18.
Sedentary work is work that involves, over the course of a typical
eight hour work day, the occasional lifting of up to 10 pounds,
more frequent lifting and occasional carrying of lighter items, and
very limited amounts of standing and/or walking, up to a maximum of
two hours in an eight hour workday.  20 C.F.R. 416.967(a).

Here, as the ALJ explained, his RFC determination was
supported by "the limited abnormal physical and mental status
examination findings[,] [and] findings and conclusions of
consultative examiners like Drs. Sirotenko, Boehlert, and Ransom[,]
and by and state agency reviewing consultants such as Drs. Kamin,
Hochberg and Putcha." T. 23.

Specifically, with respect to Plaintiff's physical
impairments, the evidence showed that Plaintiff had a history of
back pain that dated back to a 2007 motor vehicle accident, and

included a May 8, 2008 surgical procedure and post-operative diagnosis of a herniated lumbar disc. T. 16, 19, 376-379, 781-787, 803-868. Treatment notes from 2010 from Unity Rehabilitation and Neurology Spine Center reflected normal findings, including no kyphosis or scoliosis of the spine, no paravertebral spasm, negative straight leg raises, no sensory loss or weakness, and that Plaintiff's gait were intact and her deep tendon reflexes were symmetric. T. 21-22. Treatment notes from Dr. Ng in October 2010 revealed either mild or normal findings, and he prescribed Bacloflen for one week. In January 2011, Dr. Ng administered a lumbar injection. In January 2011, Plaintiff's MRI results showed stable post-operative findings with no recurrent herniation. T. 601-603. Although Plaintiff continued to complain of back pain when she visited the Spine Center in October 2011, she was assessed as stable on her current medications, her supine straight leg raises were negative, she had no motor weakness, and her sensory was decreased only at L2 in the right lower extremity. T. 1122. Further, Plaintiff's treatment notes from 2011 show that Plaintiff walked with a normal gait, her heel/toe walking was normal, and her sensation was grossly intact to light touch. T. 1035, 1036.

The ALJ's physical RFC was also supported by the consultative opinions of Drs. Sirotenko and Boehlert, and State Agency Reviewing consultant Dr. Pucha. Specifically, Dr. Sirotenko consultatively examined Plaintiff and assessed that she had moderate limitations

for kneeling, squatting, bending and climbing stairs, inclines and ladders on a repetitive basis, and needed no assistive or supportive devices. T. 1033. Similarly, Dr. Boehlert examined Plaintiff in February 2011 and assessed that Plaintiff had moderate limitations for heavy lifting, bending, twisting, ambulating and staying in one position for too long. T. 478. On March 1, 2011, State agency medical consultant Dr. Putcha reviewed Plaintiff's file and opined that Plaintiff could perform a range of sedentary work, given that she was independent in ambulation. T. 23, 509-514. The opinion of consultative physicians and State agency consultants can constitute substantial evidence where, as here, they are consistent with the other evidence in the record. See generally Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995) (opinions of consultative and State Agency physicians can constitute substantial evidence); Mongeur v. Heckler, 722 F.2d 10033, 1039 (2d Cir. 1983) (same).

With respect to Plaintiff's mental impairments, the evidence showed that Plaintiff had a history of depression and substance abuse. However, as the ALJ pointed out, Plaintiff's mental status examinations showed only limited abnormalities, that she received conservative treatments, and for which she had never received in-patient psychiatric or emergency room care. T. 21, 23, 1037-1057. Specifically, in March 2010, Dr. Jones reported generally mild or normal findings, and assessed that Plaintiff could follow and

understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, and relate adequately with others.  T. 1022. Session notes from Huther-Doyle and St. Mary's Mental Health reflected continued improvement in Plaintiff's symptoms with treatment and counseling.  Treatment records from St. Mary's show that Plaintiff's mental status examination findings were overall "unremarkable" with varying reports of depressed mood and affect, and that she actively engaged in group therapy sessions.  T. 399-461.  Notably, she was assessed GAF scores ranging from 55-75 in 2010, and a score of 55 in 2012.  T. 333-337, 401-402, 1037-1057, 679-734.  A GAF score of 51-60 represents moderate limitations, while a GAF score of 70-75 represents slight limitations.  See Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text Revision, American Psychiatric Association 2000) ("DSM-IV-TR").

The ALJ's mental RFC was also supported by the opinions of psychological consultative examiner Dr. Ransom and State Agency psychologists Dr. Kamin and Dr. Hochberg.  Specifically, Dr. Ransom performed a consultative examination of Plaintiff in February 2011 and reported that she exhibited a moderately dysphoric affect, her attention, concentration, and her immediate memory were moderately impaired.  Dr. Ransom opined that Plaintiff would have moderate

difficulty performing complex tasks, relating adequately with others, and appropriately dealing with stress.  Likewise, Drs. Kamin and Hochberg placed Plaintiff's mental health functional limitations within the moderate range.  Both opined that Plaintiff could follow simple instructions and relate and respond to others in a low contact work setting.

Accordingly, the Court finds that the ALJ's RFC was supported by substantial evidence in the record.

### 3.   The Hypothetical Posed to the VE was Based on an RFC that Adequately Described Plaintiff's Limitations which Supported the ALJ's Finding of No Disability

Plaintiff asserts that "[t]he RFC crafted by the ALJ is unclear.  The ALJ found Plaintiff 'must change positions briefly every 40 minutes,' but neglected to include specific details to properly inform the analysis of the vocational expert."  Specifically, Plaintiff points out that the ALJ failed to indicate whether Plaintiff must switch between sitting and standing or between sitting and walking, and failed to adequately define 'briefly.'  Pl's Mem at 28-29.

For the opinion of a VE to constitute substantial evidence, the hypothetical questions posed to the VE must include all of the claimant's limitations that are supported by medical evidence in the record.  See Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981) (a "vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and

capabilities, can realistically perform a particular job"); see also Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) ("A hypothetical question posed to a vocational expert must reflect all of a claimant's impairments . . . .") (internal citations and quotation marks omitted).

Here, Plaintiff testified that she could stand for "about 35, 40 minutes" before she had to sit down and could sit for "[a]bout the same amount" of time before she needed to stand. T. 52-53. Additionally, consultative examiner Dr. Boehlert opined that Plaintiff had "moderate limitation to . . . staying in one position for too long due to her back post-op." T. 478. These physical limitations were incorporated into the RFC assessment, as the ALJ determined that "[Plaintiff] must change positions briefly every 40 minutes." T. 18.

At Plaintiff's hearing, the ALJ explicitly asked the VE to consider an individual having the same age, education, and work experience as Plaintiff who has an RFC to perform the full range of sedentary work with the following limitations: limited to simple tasks, change positions briefly every 40 minutes, should have only occasional contact with coworkers and the general public. T. 71-72. The VE testified that such an individual could perform the occupations of brake linings coder and label pinker. T. 72. Because the hypothetical question posed to the VE was based on an RFC that accurately described Plaintiff's limitations, the VE's

testimony provides substantial evidence to support the ALJ's finding of no disability.

With respect to Plaintiff's particular argument that the ALJ's RFC determination was not specific as to the frequency of Plaintiff's need to alternate positions between sitting and standing, as required by SSR 96-9p, the Court finds this argument meritless.  While the ALJ did not explicitly state that Plaintiff must change positions *between sitting and standing*, the Court finds that no greater specificity was required given that he determined that Plaintiff must "change positions briefly every 40 minutes." T. 18.  As discussed above, this particular finding was supported by Plaintiff's own statements that she needed to change positions between sitting and standing (and vice versa) every 35 to 40 minutes, and on Dr. Boehlert's assessment that Plaintiff would have "moderate limitation" in staying in one position "for too long," which is consistent with ALJ's finding that Plaintiff must "change positions briefly" which allowed for a degree of flexibility to alternate positions.

Therefore, the Court finds that the ALJ's conclusion at Step 5 was supported by substantial evidence.

**CONCLUSION**

The Commissioner's Motion for Judgment on the Pleadings is granted, the Plaintiff's cross-motion is denied, and the Complaint is dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    July 31, 2014
          Rochester, New York